The CHESAPEAKE AND POTOMAC
TELEPHONE CO., Petitioner,

v.

PUBLIC SERVICE COMMISSION,
Respondent,

The Atlantic Telephone Co., Inc.,
People's Counsel, Intervenors.

No. 11027.

District of Columbia Court of Appeals.

Argued Oct. 14, 1976.

Decided Sept. 29, 1977.

Michael J. Morrissey, Washington, D. C.,
with whom Robert A. Levetown, Alfred W.
Whittaker, and Lee A. Satterfield, Washington, D. C., were on the brief, for petitioner.

Linus H. Deeny, Asst. Corp. Counsel,
Washington, D. C., with whom John R.
Risher, Jr., Corp. Counsel, and Louis P.
Robbins, Principal Deputy Corp. Counsel,
Washington, D. C., were on the brief, for
respondent.

Robert Jacobi, Washington, D. C., for intervenor, The Atlantic Telephone Co., Inc. Edwin B. Spievack and Ruth S. Baker, Washington, D. C., were on the brief.

Annice M. Wagner, Washington, D. C., for intervenor, People's Counsel.

Before GALLAGHER, YEAGLEY and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This is an appeal from an order of the Public Service Commission (Commission) which has the effect of denying petitioner, the Chesapeake and Potomac Telephone Co. (C&P), the right to initiate and make effective a rate for a "new service,"[1] the DIMENSION ® PBX, without prior Commission approval.[2] C&P contends that the Commission does not have the statutory authority to require regulated utilities to obtain prior approval before they may market a "new service."[3]

On December 29, 1975, C&P filed with the Commission a new tariff offering for the DIMENSION ® PBX. The proposed tariffs would have offered to C&P customers the DIMENSION ® PBX under either a standard monthly plan, or under a "two-tier" payment plan. The two-tier payment plan consists of (1) Tier A which covers capital costs and (2) Tier B which covers operating costs. After receiving the proposed tariff, the Commission published a notice in the D.C. Register setting February 25, 1976, as the deadline for filing comments.

On February 25, People's Counsel[4] filed objections to the proposed tariff and the Atlantic Telephone Co. filed a "Petition for Leave to Intervene."[5] Six weeks later, C&P replied to the People's Counsel and Atlantic and filed notice that the proposed tariffs would become effective as of April 20, 1976. C&P announced that it was making the tariffs effective pursuant to D.C. Code 1973, § 43–327, which provides in pertinent part:

No change shall be made in any schedule, including schedules of joint rates, except upon ten days' notice to the commission, and all such changes shall be plainly indicated upon existing schedules, or by filing new schedules in lieu thereof ten days prior to the time the same are to take effect . . . .

On April 19, People's Counsel filed a letter opposing "the company's attempt to effectuate the proposed tariffs without a formal hearing." One day later the Commission issued Order No. 5780 which is the first of three orders entered. That order stated that the new tariff "shall become effective, as filed, as of May 16, 1976." Because of doubts as to whether the rates were fully compensatory, the Commission also suspended the tariffs "effective immediately and until May 16, 1976 to permit the parties and People's Counsel to file exceptions to the proposed order, upon which a hearing will be held." In discussing its reasons for the action taken, the Commission stated it agreed with C&P that § 43–327 "affords a

---

1. At oral argument in this case, the issue of whether the DIMENSION ® PBX is a new service was discussed. The court requested that counsel submit post-argument memoranda on that point and, as a result, the Commission now expressly states that this is a new service.

2. The DIMENSION ® PBX is an "electronic private branch exchange service" (or switchboard) for business telephone subscribers. It provides service features not available in other PBXs and has been described by the Commission as a "distinct service improvement." PSC Order No. 5780 at 7.

3. Petitioner also contends that, absent such authority, there is no authority to suspend the new service indefinitely and thereby achieve a similar result. This issue is not before us for

decision, though we comment upon it briefly, *infra.*

4. People's Counsel is the statutory representative of the consumer at hearings before the Commission. D.C.Code 1975 Supp. § 43–205.

5. People's Counsel voiced concern that the Tier A rates might contain cost components which might be subject to change while the rates might be beyond future Commission review because of the long-term contractual obligation of C&P. Atlantic contended that the rates were not compensatory and that therefore the costs would have to be assumed by other consumers.

procedure by which a utility may file changes in its schedule of tariffs which may become effective without further Commission action" but that it also read D.C.Code 1973, § 43–1003, as granting to the Commission the power to suspend the new tariffs before becoming effective. That section provides:

The provisions of chapters 1–10 of this title shall be interpreted and construed liberally in order to accomplish the purposes thereof . . . . The commission . . . shall have, in addition to the powers in chapter 1–10 of this title specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated. . . .

Exceptions to Order No. 5780 were taken by both C&P and intervenor Atlantic Telephone Co. and, after oral argument, the Commission orally rescinded Order No. 5780. In rescinding the order the Commission reversed itself and stated that § 43–327 "is only a notice statute and does not give the company an automatic right to put a new tariff into effect without a hearing by the Commission."[6] Later, in still another ruling the Commission concluded that while a *hearing* is not necessary for every proposed change, the Commission's *formal approval* is required before any change can become effective.[7] C&P filed a timely notice of appeal from this order.[8]

The task before this court, then, is to determine the extent of the power of the Commission to control initially the rates for new services offered by the regulated companies.

In support of its contention that the regulated industries have the power to put into effect tariffs for new services, C&P points to prior Commission practice and the District of Columbia Public Utilities Act. It asserts that for years the Commission practice was to allow new service tariffs to become effective routinely on ten days' notice. Statutorily, C&P argues that § 43–701 which requires the approval of the Commission before any tariff may be changed applies only to those tariffs "to which an order of the commission applies." The whole statutory scheme is, according to petitioner, similar to other congressionally-enacted regulatory schemes all of which allow for some industry-initiated rates.[9]

The Commission, on the other hand, asserts that it has not allowed the industries to initiate their own rates and that in the past it has sent a letter of "acceptance" in reference to new services. Additionally, the Commission argues that although the Public Utilities Act contains "no express provisions relating to the Commission's authority to approve or disapprove proposed initial rates for a new service before they become effective," the Commission's rate-making power is so broad that it necessarily includes this power.[10] Finally, the Commission contends that the remedial nature of the Public Utilities Act ("to protect the public interest by interposing the Commission between the utilities and their customers") would be defeated if the utilities were allowed to initiate their own rates. Both People's Counsel and intervenor Atlantic

---

**6.** Commissioner Stratton dissented and noted that he would have affirmed Order No. 5780.

**7.** The Commission cited no specific statutory provision in support of its conclusion.

**8.** In its answer to C&P's petition of appeal, the Commission asserted that its order was not a final order and that therefore this court was without jurisdiction. We find, however, that "the impact of [the Commission's order] is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d

681 (1967). Apparently, the Commission now does not dispute this point as it is not argued in its brief.

**9.** Ordinarily, such statutes contain a "suspension clause," which gives the regulatory agency considerable control over the industry-initiated rate. *See* note 18, *infra.*

**10.** The PSC states that there are two types of regulatory statutes: (1) suspension statutes which do allow for industry-initiated rates and (2) those statutes which provide for only Commission-made or approved rates.

Telephone Co. are in basic agreement with the Commission.

The statute under which the Public Service Commission operates was enacted by Congress in 1913. Since then it has remained substantively the same with only minor changes not relevant here. This was the period when utility regulation commenced in this country. The legislative history is bare as to the meaning of the sections at issue in this case and, consequently, we are left with the task of interpreting an ambiguous statute, which is also antiquated.

The principal issue is whether the regulated companies can initiate and put into effect rates for "new services" without prior Commission approval or whether, as the PSC argues, the statute contemplates only Commission-approved rates. The provisions which address themselves to Commission approval of, or setting of, rates are §§ 43–323, 43–401, 43–408, 43–411, and 43–701.

Section 43–323 provides that "Every public utility shall file with the commission" schedules of all rates that "it has established and which are in force at the time . . ." and that those rates "shall not exceed the rates, tolls, and charges allowed by law on March 4, 1913." It further provides that those rates "shall be the lawful rates, tolls, and charges . . . and shall remain and be in force *until set aside by the commission*." (Emphasis added.) Section 43–401 provides that:

[E]very public utility in the District of Columbia shall, within thirty days after March 4, 1913, file in the office of the commission copies of all schedules of rates and charges, including joint rates, in force on March 4, 1913; third, any public utility desiring to *advance or dis-*

*continue* any such rate or rates *may make application to* the commission in writing . . . fourth, *upon receiving such application the commission shall fix a time and place for hearing, and give such notice to interested parties* as shall be proper and reasonable; if, after such hearing and investigation, the commission shall find that the charge or discontinuance applied for is reasonable, fair, and just, it shall grant the application, either in whole or in part . . . .. [Emphasis added.]

These two sections address themselves primarily to the rates of 1913 (the birthdate of the statute), and are now essentially of historical interest.[11] It is evident that under §§ 43–323 and 43–401 Commission approval is necessary for a change in an existing rate.

Sections 43–408 and 43–411 address themselves to the power of the Commission to investigate rates and set new rates if, after investigation and a hearing, the rates are found to be unlawful. These sections provide:

§ 43–408.

Upon its own initiative or upon reasonable complaint made against any public utility that any of the rates . . . are in any respect unreasonable or unjustly discriminatory . . . the commission may, in its discretion, proceed . . . to make such investigation as it may deem necessary or convenient. But no order affecting said rates . . . shall be entered by the commission without a formal hearing.

§ 43–411.

If upon . . . investigation the rates . . . shall be found to be unjust, unreasonable, insufficient, or unjustly discriminatory . . . the commis-

---

11. See Statement of Commissioner William R. Stratton in this Proceeding Concerning Reconsideration of Commission Orders 5780 and 4792 (1976), in which he stated:

Two sections of our law (43–323 and 43–401) seem to speak only as of March, 1913, when the Public Utility Act was passed. . . By now, in 1976, none of the original rates is any longer in effect; they have all been set

aside, changed, or discontinued with Commission approval under either 43–323 or 43–401. The purpose of these two sections could only have been to "grandfather" the pre-1913 Congressionally-established rates until set aside or changed by the Commission. These two statutory provisions have served their purpose and are now of only historical interest.

sion shall have the power to determine and by order fix and order to be substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable.

And finally, § 43–701 took away from the regulated companies their then existing common-law right to change any rate set by the Commission. That section provides:

All public utilities to which an order of the *commission applies shall make such changes in their schedules on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any public utility in such rates, tolls, or charges . . . without the approval of the commission.* [Emphasis added.]

This section is, in effect, a means of enforcing Commission-made rates. *See* § 43–411.

Thus we are left with legislation, outmoded as it is, which requires Commission approval of *changes* in rates which the Commission has itself set, *see* § 43–701 or, if §§ 43–323 and 43–401 are taken into account, for existing rates. It is silent on the subject of new services. The likelihood is that, in the early era of utility regulation (1913), Congress considered that the legislation covered all eventualities then foreseen, *i. e.*, specific provisions for maintaining in effect schedules then existing and provisions relating to subsequent changes.

 The Commission is a creature of statute and has only those powers given to it by statute. *Ohio Bell Telephone Co. v. Public Utilities Commission,* 17 Ohio St.2d 45, 46, 245 N.E.2d 351, 352 (1969). *See also* A. Priest, Principles of Public Utility Regulation 10 (1969); *cf. Patrick v. Smith,* 60 App.D.C. 6, 45 F.2d 924 (1930). On the other hand, "[m]odern regulatory legislation . . . is generally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and

not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference." [12] As a matter of fact, this Act has a provision to this effect. (*See* D.C.Code 1973, § 43–1003, quoted *supra.*) Even so, courts have been reluctant to read into a statute powers for a regulatory agency which are not fairly implied from the statutory language since the agency is statutorily created. *See, e. g., Delaware River Port Authority v. Pennsylvania Public Utility Commission,* 393 Pa. 639, 145 A.2d 172 (1958). Into this pot must be mixed the settled proposition in administrative law that, when faced with statutory construction, an appellate court should give "great deference to the interpretation given the statute by the . . . agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

C&P contends that under this Act there is a crucial regulatory difference between a "new service" and change of existing rates to which an order of the Commission applies. When it comes to a change of existing rates, concededly the Commission prescribes the new rates upon hearing and order. (D.C.Code 1973, §§ 43–408, –701.) But, says C&P, the industry has free rein to set its own rates if it is a "new service" because in this event the company retains its common-law right to establish the rate as the Public Utilities Act nowhere empowers the Commission to delay or prevent a "new service" offering from becoming effective beyond the 10-day statutory notice period (D.C.Code 1973, § 43–327).

That statute simply provides, however, that "no change shall be made in any schedule . . . except upon ten days' notice to the commission . . . ." When faced with a contention such as C&P's in relation to a similar notice statute in the Natural Gas Act,[13] the Supreme Court decided that

---

12. 3 Sutherland's Statutory Interpretation § 61.03, at 52 (C. Sands, 3d ed. 1973).

13. 15 U.S.C. §§ 717–717w (1970).

the provision is a prohibition and not a grant of power, and is simply a filing and notice requirement. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

Turning to its common-law argument, C&P essentially contends the rationale of the statute requires Commission approval after hearing of a change in an existing rate and leaves to industry initiative the setting of a rate not previously prescribed by the Commission. This assertedly follows from the lack of a statutory provision dealing with new services, thus resulting in the application of a common-law right.

Reduced to terms applicable to this case, petitioner is arguing, in necessary effect, that while the statute requires a Commission hearing and order to change existing telephone rates this procedure does not apply to a new rate for a technologically improved PBX system. On this newly improved PBX system, says C&P, there is a common-law right in the Telephone Company to *initiate* the rate, although the rate may be changed in the future by the Commission after hearing and order. A statement of the proposition does nothing to recommend it. We would adopt that view of the statute only if it were to be there expressed in recognizable terms, as in the Ohio Public Utilities Act, *Ohio Bell Telephone Co. v. Public Utilities Commission, supra.*[14]

While it appears to be correct to denominate this technologically improved PBX system as a "new service,"[15] the question here is whether the Act requires the Commission to treat this "new service" differently, in a regulatory sense, from changes in rates. There is, as we have said, no reference in the Act to "new services" and no procedural provision explicitly relates to them.

■ The actuality is that there now exists a schedule containing rates and conditions of service for PBX service. C&P seeks to change this schedule by offering a new type of PBX equipment at different rates. This would require a change of an existing schedule, which was established by a prior Commission order. In the absence of a controlling statutory provision, we see no reason to construe this service offering as essentially different from a rate change application, where Commission approval is statutorily required.

C&P claims for itself a common-law right of rate initiation as to "new services." As we construe the Act, however, the Company's common-law right was abrogated when this remedial legislation was enacted. Moreover, as we have related, there is an explicit command in the Act to construe it "liberally in order to accomplish the purposes thereof." D.C.Code 1973, § 43–1003.

C&P proceeded before the Commission under the provisions of § 43–327, *supra*, upon the basis that this statute gave it the right to initiate rates which became effective after the expiration of the 10-day notice provision. But, as we have demonstrated, this statute is simply a filing and notice provision and, contrary to C&P, does not contain a grant of power to the utility. *United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra.*

As we indicated earlier, C&P asserts that in the past the Commission has not required the Company to obtain prior approval of a "new service." The Commission asserts, on the other hand, that over the years C&P has submitted numerous filings of this nature accompanied by a covering letter requesting "acceptance" of the filing and drawing attention to the 10-day notice clause of the statute (D.C.Code 1973, § 43–327). These filings were reviewed by the Commission staff which then made appropriate recommendations to the Commission and if nothing objectionable was found the

---

**14.** We can well understand, however, the desirability of getting a new service into operation as soon as feasible in the interest of the users and the company, which invested in the service.

**15.** In its post-argument memorandum, the Commission so designates it.

Commission would issue a routine letter "accepting" the tariff. Recently, the Commission adopted the practice of issuing formal orders after an open meeting.[16] Evidently, a comparatively large quantity of this type of filing emanates from C&P and, relatively speaking, they are not usually of material significance from a regulatory standpoint.[17] We perceive no substantial departure from past procedures of the Commission in respect to new services[18] and, contrary to petitioner's assertion, the procedure here does not appear to transgress the net effect of the Commission's previous interpretation of the Act. *Udall v. Tallman, supra.*

 We see no barrier in § 43–408 to the streamlined procedure which has been employed by the Commission in relation to the numerous filings for "new services" by the Telephone Company.[19] Essentially, that statute requires a formal hearing only when the Commission proceeds upon its own initiative, or a reasonable complaint is made against a utility, on the basis that a rate, schedule or service appears unreasonable or unjustly discriminatory. When, however, there is a typical "new service" filing[20] by the Telephone Company to which no "reasonable objection" is made, and it is acceptable to the Commission, there is no statutory requirement for a formal hearing before approval.

We view the Act as requiring filing and notice to the Commission in order to enable it to effectuate its statutory duty to exercise its sanction of all rates before they become effective.

*Affirmed.*

16. The open meetings are held pursuant to § 740 of the District of Columbia Self Government and Governmental Reorganization Act. Act of Dec. 24, 1973, 87 Stat. 774.

17. The Commission also points to a few proceedings in the past, involving other utilities for the most part, where a Commission order of approval preceded initiation of rates.

18. We should observe, however, that after more than 60 years of existence the Commission is split in this case on a fundamental aspect of the Act. The Commission is now apparently divided on whether the Act contains "suspension" authority, i. e., the power of a Commission to prevent rates initiated by a regulated company from becoming effective prior to a hearing (*compare* Statement of Commissioner Stratton, note 11 *supra, with* Order Rescinding Order No. 5780, May 12, 1976 (oral order)). This authority is common in the various states, but it is not expressly contained in the Act and it is a statutory authority too fundamental to imply—however desirable it might be thought to be in aid of the regulatory function of the Commission. A well-drafted, modernized utility act—of which codes of the various states are replete—should avoid in the future such belated fundamental conflicts on the rationale of the legislation.

A seasoned and able member of the Commission stated in this proceeding:

I am honestly bewildered trying to reconcile the provisions of our statute that are on [their] face irreconcilable. [Tr. at 43]

This comment is not difficult to understand. It is a matter of concern that a Public Utility Act over 60 years old is so lacking that the agency (Public Service Commission) of the same vintage has grave difficulty construing the Act's fundamentals. This is evidenced by the flip-flop of the majority in this proceeding, as earlier related, and the final split decision on the rationale of the Act. (*See* Order Nos. 5780 and 5792; Statement of Commissioner Stratton, note 11 *supra.*)

This statutory problem is, of course, in the end something for consideration by the legislature and not the courts. But we do think it is too important not to bring to the surface.

19. In its brief, the utility appears to contend that § 43–408 requires a formal hearing. This argument is made in the context that there is no suspension authority in the Act. We agree that there is no such authority in the Commission (*see* note 18, *supra*) as this term is commonly understood in utility law. But here there was, in effect, a complaint made in relation to the proposed rate on the improved PBX service, which would in turn necessitate a schedule change, and the Commission itself saw reason to withhold initial approval, all of which necessitated a formal hearing under § 43–408.

20. What constitutes a "new service" in utility terminology may by its nature often be a question open to administrative determination.