BELL ATLANTIC—WASHINGTON, D.C., INC., Petitioner,

v.

The PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent,

and

People's Counsel of the District of Columbia, Intervenor.

No. 94–AA–456.

District of Columbia Court of Appeals.

Argued Nov. 16, 1994.

Decided March 20, 1995.

Sherry F. Bellamy, with whom Michael D. Lowe and John M. Walker, Arlington, VA, were on the brief, for petitioner.

Daryl L. Avery, with whom Peter G. Wolfe, Washington, DC, was on the brief, for respondent.

Michael McRae, with whom Elizabeth A. Noel, Sandra Mattavous, Washington, DC, Cathy Thurston, Silver Spring, MD, and Lynn Janis, Washington, DC, were on the brief, for intervenor.

Before FERREN and SCHWELB, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

In 1984, Bell Atlantic Corporation (Bell Atlantic) was established as one of the divested Regional Bell Holding Companies following the break up of the American Telephone and Telegraph Co. (AT & T). Bell Atlantic—Washington, D.C., Inc. (BA–DC), formerly the Chesapeake and Potomac Telephone Co. (C & P), is a wholly-owned subsidiary of Bell Atlantic, and provides local telephone service in the District of Columbia. It has petitioned

for review of a rate case decision of the Public Service Commission of the District of Columbia, Formal Case No. 926, establishing and reaffirming on reconsideration a revenue requirement and setting new rates for telephone services by BA–DC.[1]

BA–DC filed an application requesting a rate increase of $35.1 million in March 1993. After an extensive eight-month proceeding, the Commission issued its initial decision, Order No. 10353, authorizing a rate increase of $15.8 million. BA–DC and the Office of the People's Counsel (OPC) applied for reconsideration of that order and, in Order No. 10383, the Commission reaffirmed its earlier decision. BA–DC then petitioned for review by this court.

BA–DC's main argument on appeal is that the Commission's decision to use Bell Atlantic's capital structure for ratemaking purposes, rather than the capital structure of BA–DC was, unreasonable, arbitrary, and capricious and should be reversed.[2] Because we conclude that the Commission's findings were based upon substantial evidence and were not unreasonable, arbitrary or capricious, and are satisfied that the Commission adequately explained the reasons for its decision, we affirm.

## I.

■ As we have repeatedly stated, the scope of our review of Commission orders is limited. *See, e.g., Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n,* 514 A.2d 1159, 1162–63 (D.C.1986) (This court's review of a Public Service Commission ratemaking decision "is the narrowest judicial review in the field of administrative law"). The Commission's factual findings are conclusive unless they are "unreasonable, arbitrary or capricious." D.C.Code § 43–906 (1990). "As long as there is substantial evidence to support a reasoned conclusion of the Commission," this court must affirm. *Washington Public Interest Org. v. Public Serv. Comm'n,*

446 A.2d 28, 32 (D.C.1982) (internal quotations and citations omitted). It follows that a party seeking to overturn a Commission order "carries a heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken"—simply proposing a valid alternative to the actions taken by the Commission is not enough. *Chesapeake & Potomac, supra,* 514 A.2d at 1163 (citations omitted). Our deference, of course, has limits, for the Commission has "the burden of showing fully and clearly why it has taken the particular ratemaking action." *Washington Gas Light Co. v. Public Serv. Comm'n,* 483 A.2d 1164, 1169 (D.C.1984) (citations omitted); *Chesapeake & Potomac, supra,* 514 A.2d at 1163.

■ We preface our discussion of the Commission's determinations in this case by observing that a regulatory commission faces a difficult task when it is called upon to determine a reasonable rate of return for a regulated utility which, like BA–DC, is wholly owned by a parent holding company. The parent company normally has the ability to control the ratio of debt to equity in the capital structure of its subsidiary. That ratio is important in rate determinations because equity is usually a more expensive form of capital than is debt. If a holding company were to move some of its own equity onto the books of its subsidiary, that would create a basis on which the subsidiary could seek a greater return on regulated operations. For these reasons, a regulatory commission must scrutinize a regulated subsidiary's submission that its capital structure is the same as it would be if the subsidiary were independent.

Prior to the divestiture of AT & T, the Commission historically used AT & T's consolidated capital structure in determining the rate of return of BA–DC, then C & P. *See Chesapeake and Potomac Tel. Co.,* Formal Case No. 798, Order No. 7886, 4 D.C.P.S.C. 267, 311 (October 3, 1983); *Chesapeake and*

---

1. *Chesapeake and Potomac Tel. Co.,* Formal Case No. 926, Order No. 10353, 1993 WL 563075 (December 21, 1993); *Chesapeake and Potomac Tel. Co.,* Formal Case No. 926, Order No. 10383, 1994 WL 82901 (February 22, 1994).

2. BA–DC also argues on appeal that the Commission acted unreasonably, arbitrarily, and capriciously when it ordered BA–DC to reclassify certain equipment for intrastate depreciation purposes. We reject that argument for reasons stated below.

*Potomac Tel. Co.,* Formal Case No. 827, Order No. 8300, 6 D.C.P.S.C. 325, 362 (August 9, 1985).[3] In its last general rate case, Formal Case No. 850, the Commission decided to use Bell Atlantic's consolidated capital structure instead of BA–DC's actual capital structure for ratemaking purposes. *Chesapeake and Potomac Tel. Co.,* Formal Case No. 850, Order No. 9927, 13 D.C.P.S.C. 67, 79–81, 1992 WL 510031 (January 29, 1992); *Chesapeake and Potomac Tel. Co.,* Formal Case No. 850, Order No. 9983, 13 D.C.P.S.C. 346, 358, 1992 WL 548069 (March 6, 1992). In making and reconfirming this decision, the Commission expressed its preference for using BA–DC's actual capital structure, but found that BA–DC had failed to provide sufficient evidence to rebut the Commission's findings of actual manipulation of BA–DC's capital structure by Bell Atlantic. Formal Case No. 850, *supra,* 13 D.C.P.S.C. at 79–81, 1992 WL 510031.

Specifically, the Commission found in No. 850, 1992 WL 510031 that Bell Atlantic's capital structure was the capital structure that actually financed BA–DC because the evidence revealed that Bell Atlantic set debt ratio ranges within which BA–DC was expected to remain; that BA–DC's dividend payout ratios were manipulated in order to increase BA–DC's equity ratio for ratemaking purposes; that BA–DC's equity ratio was significantly higher than Bell Atlantic's even though BA–DC's lower business risk should have produced a lower equity ratio; and that Bell Atlantic could not feasibly operate its non-regulated businesses with the amount of equity remaining after the balance sheets of its subsidiary Bell operating companies were subtracted. Formal Case No. 850, *supra,* 13 D.C.P.S.C. at 79–80, 1992 WL 510031. The evidence of manipulation of dividend rates in the prior proceeding was especially strong. It included a letter from the President and

CEO of BA–DC to Bell Atlantic asking for permission to defer the third quarter dividend in order to affect BA–DC's debt ratio for purposes of an upcoming rate case.

Relying on essentially the same reasons that it had cited in Case No. 850, 1992 WL 510031, the Commission decided in the case before us to use Bell Atlantic's consolidated capital structure (with important adjustments that benefitted BA–DC) for ratemaking purposes instead of using BA–DC's actual capital structure. Order No. 10353, *supra,* at 22, 1993 WL 563075. The Commission noted again its continued preference for using BA–DC's actual capital structure; but concluded that BA–DC had failed once again to satisfy its evidentiary burden to justify its use. *Id.* at 22–25, 1993 WL 563075.

## II.

■ The Commission properly placed the burden on BA–DC to prove that Bell Atlantic does not control or manipulate BA–DC's capital structure. The details of BA–DC's financial relationship to Bell Atlantic were crucial to the Commission's determination of which capital structure, the parent's or the subsidiary's, should be used for ratemaking purposes because such information reveals the actual source of BA–DC's day-to-day financing. BA–DC is obviously in the best position to provide the Commission with this important information. Most importantly, the Commission's rulings in Formal Case Nos. 827 and 850, 1992 WL 510031 had plainly stated what the Commission expected of BA–DC in this respect, and the latter order had made findings regarding the relationship and interaction between Bell Atlantic and BA–DC which would virtually require the continued use of Bell Atlantic's capital structure unless BA–DC established satisfactory reasons for doing otherwise.[4]

---

**3.** In its first post-divestiture rate case, the Commission decided to use BA–DC's actual capital structure instead of Bell Atlantic's capital structure for ratemaking purposes. Formal Case No. 827, *supra,* 6 D.C.P.S.C. at 364; *Id.* at 383. However, in making that decision, the Commission expressed concern about the possibility of Bell Atlantic's manipulating BA–DC's capital structure to serve Bell Atlantic's interests rather than "seeking to employ the capital structure

with the least cost to D.C. ratepayers." *Id.* at 364. The Commission stated that it would "carefully scrutinize this matter" in future cases and ordered BA–DC to "present evidence detailing how Bell Atlantic determines C & P's [now BA–DC's] capital structure." *Id.*

**4.** The Commission provided BA–DC with adequate notice of its evidentiary burden. In Formal Case No. 827, it directed BA–DC (then C &

■ The Commission's factual findings of actual and potential manipulation were not unreasonable, arbitrary or capricious.[5] Most significantly, BA–DC failed to present sufficient evidence to refute Commission's finding in Case No. 850, 1992 WL 510031 *and* the evidence in this case that Bell Atlantic sets debt ratio ranges within which BA–DC is expected to remain. Order No. 10353, *supra*, at 23, 1993 WL 563075. We cannot agree with BA–DC's contention that it would actually have to adopt an "admittedly irrational capital structure" to satisfy its evidentiary burden. Rather, as stated in Order No. 10353, *supra*, at 23, 1993 WL 563075, BA–DC simply has to provide sufficient evidence that it is free to set its own debt ratios.[6] We take the Commission to mean that BA–DC must show that it can and has set a debt ratio which is wholly appropriate to its role as a regulated provider of telephone services, and has in no sense been influenced by its relationship to Bell Atlantic in doing so.

Although there was no evidence of dividend payout manipulation presented in this proceeding as there had been in the last such proceeding, Formal Case No. 850, 1992 WL 510031, the Commission did not rely on this factor in deciding which capital structure to use. Order No. 10353, *supra*, at 23, 1993 WL 563075 ("If this were the only factor to consider, the Commission would not find the use of the Bell Atlantic capital structure to be appropriate"); Order No. 10383, *supra*, at 9, 1994 WL 82901. However, if evidence had been presented of continued dividend payout manipulation, BA–DC would have had the burden of refuting it.[7]

With respect to the relative amounts of debt and of equity in BA–DC's capital structure compared to that of Bell Atlantic, the record supports the Commission's factual findings. Based on the Commission's findings in this proceeding, the percentage of equity in Bell Atlantic's capital structure continues to be significantly lower than that in BA–DC's capital structure even though BA–DC's business risk remains lower than that of Bell Atlantic. Order No. 10353, *supra*, at 23–24, 1993 WL 563075. "This disparity is inconsistent with the general rule that the amount of equity in a company's capital structure is directly related to that company's business risk." *Id.* at 23, 1993 WL 563075. Moreover, evidence presented in the present proceeding revealed that Bell Atlantic's consolidated structure would contain even less equity if the Bell operating compa-

P) to present evidence in the next ratemaking case of the details of its financial relationship with Bell Atlantic. *See* note 3, *supra*. The Commission again emphasized BA–DC's evidentiary burden in its analysis and conclusions in Formal Case No. 850, 1992 WL 510031. *See supra* p. 5; *see also Chesapeake & Potomac, supra*, 514 A.2d at 1166 n. 6 (C & P was put on sufficient notice of its burden to provide certain information to the Commission where the Commission had required the same information in previous orders).

**5.** We do not face in this case the question whether the potential for manipulation, unaccompanied by any conduct on the part of the parent and the subsidiary from which actual manipulation could reasonably be inferred, would provide the Commission with a sufficient basis for using the capital structure of the parent in determining the revenue requirement of the subsidiary. In the event we should be presented with such a case in the future, we would, of course, consider the Commission's findings and rationale under our usual standard of review. But that is not the case before us, as here the Commission relies on actual as well as potential influence of the parent upon the subsidiary.

**6.** Although BA–DC claims in its reply brief that the record contains "a clear statement that the

recommendations [by Bell Atlantic] can be exceeded where appropriate," it did not cite to any such clear statement. Simply stating that two out of the seven Bell Atlantic operating telephone companies have debt ratios that are not within Bell Atlantic's guidelines does not provide enough information. This statement reveals nothing about Bell Atlantic's general policy towards its local operating companies, or the particular circumstances relating to those two companies. Furthermore, and more important, this statement reveals nothing about Bell Atlantic's financial relationship with BA–DC.

**7.** "C & P's [BA–DC's] argument in this proceeding that its dividend payout ratios have been less than 100% fails to answer the central question of whether such payout ratios are manipulated to maximize Bell Atlantic's returns at the expense of C & P's [BA–DC's] ratepayers." Order No. 10353, *supra*, at 23, 1993 WL 563075. This statement by the Commission properly places the burden of persuasion on BA–DC. However, since no evidence of dividend payout manipulation was presented in this proceeding, the Commission appropriately decided not to base its ruling on this factor.

nies' balance sheets were removed than was the case when the record was made in Case No. 850, 1992 WL 510031. *Id.* at 24, 1993 WL 563075; *see* text, *supra,* at 5.[8]

The sum of BA–DC's complaint against the reasonableness of the Commission's action is that by imputing to BA–DC the capital structure of Bell Atlantic, the Commission calculated BA–DC's revenue requirement based on the lower cost of debt rather than the higher cost of equity on 11.6% of BA–DC's equity.[9] The Commission has taken the position, for the reasons we have summarized, that circumstances fully justified its imputation of Bell Atlantic's capital structure. It adds that, in any event, the use of Bell Atlantic's structure has a legally insignificant impact on BA–DC's rate of return, reducing it from 9.73%, the figure which would result from use of BA–DC's capital structure, to 9.69%, a difference of only .04%. *See* Order 10383, *supra,* at 11–12, 1994 WL 82901. Citing *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n,* 498 A.2d 1167, 1169 (D.C. 1985), the Commission argues that if the total effect of a rate order is not unjust or unreasonable, a reviewing court should not disturb the order. *Id.* This principle is applicable here. *See Washington Gas Light Co. v. Public Serv. Comm'n,* 450 A.2d 1187, 1193 (D.C.1982) (quoting *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) where the Supreme Court established that "it is the 'total effect' of a rate order, rather than the theory employed, that determines its validity"). While BA–DC argues

that the imputation of Bell Atlantic's capital structure leads to a significant reduction in its revenues, it neither relates that asserted loss to its rate of return, nor challenges expressly the Commission's conclusion regarding rate of return.

### III.

■ Turning to BA–DC's second argument on appeal, we conclude that the Commission acted reasonably in ordering BA–DC to adjust the depreciation expense of its associated equipment for ratemaking purposes.[10] BA–DC was following the policy of basing depreciation expense on the lives of analog switches. According to the record, the service lives of such switches are very short. There was also substantial uncontested evidence presented in this proceeding supporting the Commission's finding that digital switches are more accurate than analog switches as indicators of the remaining life of associated equipment. Order 10353, *supra,* at 104–106, 1993 WL 563075. For example, although BA–DC wire centers contain both analog and digital switches, BA–DC based its depreciation expense for associated equipment *solely* on the service life of its analog switches. *Id.* at 106, 1993 WL 563075. However, when OPC presented BA–DC's own data which showed that substantial investment in such associated equipment remained after the retirement of analog switches, BA–DC acknowledged that its overall policy was to transfer associated equipment investment to digital switches after retirement of analog switches.[11] *Id.*

8. Although we have no basis for overturning the conclusion the Commission drew from its findings comparing BA–DC's equity level to Bell Atlantic's equity level, the record does contain significant evidence pointing in the other direction. For example, BA–DC argues that Bell Atlantic's diverse and varied businesses are such that its consolidated capital structure should have less equity in it than BA–DC. However, BA–DC failed to provide sufficient details about Bell Atlantic's other businesses to substantiate this contention. Furthermore, we will not disturb on this record the Commission's conclusion that BA–DC failed to establish that the amount of equity in its own capital structure was actually proportional to its own real business risk. Order No. 10353, *supra,* at 24, 1993 WL 563075; *id.* at 39–40, 1993 WL 563075.

9. BA–DC's actual capital structure was approximately 58.1% equity and 41.9% debt. Bell Atlantic's capital structure was approximately 46.5% equity and 53.5% debt. Thus, Bell Atlantic's debt percentage was 11.6% higher than BA–DC's.

10. "Associated equipment" is equipment used in conjunction with a telephone switch such as power plants, distributing frames, lighting, rolling ladders and cable racks.

11. The U.S. telecommunications network has three components: *terminals* (e.g., an ordinary telephone, a fax machine, a computer), *transmission mediums* (e.g., copper wire, microwave radio, satellite radio, fiber optic cable), and *switches* (devices that route the call to its destina-

Given the evidence presented and its indications of the current status of digital technology, we can not conclude that the Commission's finding was unreasonable, arbitrary or capricious.

## IV.

Because we conclude that the Commission's factual findings were based upon substantial evidence, and were not unreasonable, arbitrary or capricious, and that the Commission adequately explained the reasons for its decision, we find no error of law requiring reversal. Accordingly, the Commission decision in Formal Case No. 926, 1994 WL 82901 is affirmed.

*So ordered.*

tion). Leonard S. Hyman, *et al.*, THE NEW TELE-COMMUNICATIONS INDUSTRY: REVOLUTION AND ORGANIZATION 17 (Public Utilities Reports, Inc.) (1987). The key aspects of a transmission sent over the network are the type of medium used—the transmission medium—and the type of signal sent. North American Telecommunications Association INDUSTRY BASICS 13 (4th ed. 1991). There are two types of signals: analog and digital. *Id.* at 14. An analog signal is a continuous wave that varies constantly in frequency and amplitude (similar to normal speech patterns); whereas a digital signal is a discontinuous stream of on/off pulses (similar to the digital bits used by computers). *Id.* at 15. Thus, a digital switch is one that is used to perform the routing of digital signals and an analog switch routes analog signals. "In order to transmit computer messages better and to take advantage of the versatility of computerized communications equipment, the network is becoming increasingly digitized." THE NEW TELE-COMMUNICATIONS INDUSTRY, *supra*, at 18.