### WASHINGTON GAS LIGHT COMPANY, Petitioner,

v.

### DISTRICT OF COLUMBIA PUBLIC SERVICE COMMISSION, Respondent,

and

### Office of the People's Counsel, Intervenor.

### No. 03–AA–788.

District of Columbia Court of Appeals.

Argued Feb. 18, 2004.
Decided Aug. 5, 2004.

Keith Townsend, with whom Beverly J. Burke was on the brief, Washington, for petitioner.

Kimberly Lincoln–Stewart, Public Service Commission, with whom Richard Beverly, Public Service Commission, was on the brief, for respondent.

Brian O. Edmonds, Office of the People's Counsel, with whom Elizabeth A. Noël, People's Counsel, Sandra Mattavous–Frye, Deputy People's Counsel, Jennifer L. Emma, Assistant People's Counsel, Scott H. Strauss, of Counsel, and Andrea G. Lonian, of Counsel, were on the brief, for intervenor.

Before TERRY and RUIZ, Associate Judges, and KING, Senior Judge.

RUIZ, Associate Judge:

Petitioner, Washington Gas Light Company ("WGL" or "Company"), appeals a decision by the District of Columbia Public Service Commission ("PSC" or "Commission") directing WGL to keep its Anacostia customer service center open. First, WGL contends that the Commission exceeded its statutory authority and that its decision impermissibly interfered with WGL's management decisions regarding the Company's operations. Second, WGL argues that, in reaching its decision, the Commission utilized a legislative process that impermissibly deprived the Company of its procedural due process right to adjudication of disputed facts through an evidentiary hearing. Third and finally, WGL contends that the Commission's order is not supported by substantial evidence. We reject all of petitioner's arguments and affirm the Commission's order.

## I. BACKGROUND

On December 2, 2002, WGL informed the Commission of its intent to close the Company's Anacostia customer service center and to discontinue receiving cash payments at its main office, then located at 1100 H Street, N.W., effective January 2, 2003.[1] Specifically, WGL stated that it had decided to close the Anacostia location because it was not cost effective, that customers had other bill payment options, and that alternative payment locations were available within the city to accept customer payments.

Pursuant to D.C.Code § 1.204.93 (2001), the Commission issued Order No. 12627 on December 27, 2003, commencing an investigation, Formal Case No. 1014, of WGL's proposed closure of the Anacostia service center. It also directed the Company to keep the Anacostia center open during the investigation. As part of the investigation, the Commission sent WGL a series of data

1. Currently, WGL's main office is located at 101 Constitution Avenue, N.W., Washington, D.C. 20080.

requests and sought its opinion on the impact that the closure would have on services provided to customers and whether the planned closing was in the best interest of District of Columbia ratepayers.

On January 2, 2003, the Office of the People's Counsel ("OPC") moved to intervene in the case, and requested a formal public hearing to ascertain the views of District of Columbia ratepayers and consumers directly affected by WGL's proposed closure of the Anacostia service center.

On January 8, 2003, WGL filed an application for reconsideration of the Commission's decision to stay the closing of the Anacostia office. WGL argued that the Commission's stay violated WGL's due process rights, was *ultra vires,* and was unsupported by the record. In addition, WGL asserted that the stay impermissibly interfered with the Company's management decisions regarding its operations. In support of its proposal to close the Anacostia location, WGL explained that (1) a service center had been operating at that location since 1990 "for the sole purpose of ... customer service," including accepting bill payments, taking customer complaints, opening and closing accounts, and providing account information, billing rates, budget payment plans, energy assistance, and extended payment plans; (2) SunTrust Bank, First Virginia Bank, and Farmers Bank of Maryland would accept customers' gas payments; (3) customer privacy would be safeguarded because the alternative locations would have access to only WGL account numbers and payment amounts, not to other customer information; (4) the quality of service to customers would be maintained because the main office at 1100 H Street, N.W. was accessible and able to handle customer service billing issues; and (5) WGL had expanded options to allow customers greater flexibility in managing

accounts by providing a number of different payment alternatives: check or money order by mail; cash, check, or money order in person at the participating banks; payment by phone using a bank account or credit card; direct debit from checking or savings account; payment on the Internet at the WGL web site, using a bank account or credit card; and payment by check or credit card (but not cash) at WGL's main office. WGL argued that these payment alternatives were "viable" options for its Anacostia customers and that maintaining the operations at the customer service facility in Anacostia was not in the public interest because other customers would bear the expense of subsidizing the costly operation. According to WGL, closing the building in Anacostia would save $286,000 in labor, benefits, supplies, overhead, security, and janitorial services.

On January 24, 2003, the Commission issued a notice scheduling two public hearings on January 29 and February 1, 2003. WGL disagreed with the Commission's proceedings and renewed its objection that the Commission was acting *ultra vires* and without evidentiary support for its actions.

Over thirty-five members of the community spoke at the public hearings about WGL's proposal to close the Anacostia payment center. All opposed closing the center and eliminating the option to make cash payments at the main office location. Ward 8 Council Member, Sandy Allen, testified that the banks selected as alternative payment locations are not viable options because one of them (SunTrust Bank) would no longer accept gas payments as of March 1, 2003, and another (First Virginia Bank) has no branches in the city. Council Member Allen also testified that some members of the Anacostia community do not have bank accounts, credit cards, or access to the Internet to pay bills on-line. Hannah Hawkins, a resident of Anacostia,

testified that since the opening of the Anacostia payment center, she no longer had to travel downtown on two to three buses in order to pay her bill, speak to a WGL representative about her account, or make payment arrangements if necessary. Virginia Major, also a resident of Anacostia, testified that she called the telephone number listed to pay by credit card and learned that a service fee is charged by a third-party credit card processor for handling the bill. She added that neither WGL nor the automatic telephone service advised her "up front" that the processing fee would equal 2.5% of the total amount of the gas bill. In addition, the Ward 8 Protest Planning Committee presented a petition opposing the Anacostia closure which contained 1,000 signatures, and later filed with the Commission a "Community Brief" on February 26, 2003, incorporating the comments made at the public hearings and asking the Commission to consider the impact of the closure upon the community, citing such factors as lack of Internet access, bank accounts and credit cards, and the imposition of credit card processing fees. WGL officials and counsel were present at the public hearings, but stated that their role in the hearings was to "listen." On January 31, 2003, WGL informed the Commission that it had reconsidered its previous decision and would continue to accept cash payments at its main office.

On March 21, 2003, the Commission denied WGL's request for reconsideration of the order commencing the investigation. The Commission noted that payment centers and the number of payment options available to ratepayers are an integral dimension of the provision of utility services in the District of Columbia. *See* Comm'n Order No. 12688 (Mar. 21, 2003) (citing *Commonwealth v. Erie Excavating & Grading Co.,* 42 Pa. D. & C.2d 544, 548–49 (Pa.C.P. Dauphin 1967), for the proposition that "service" includes "any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities ... in the performance of their duties ... to their patrons ... and the public."). The Commission explained that it disagreed with WGL's suggestion that the variety of alternative forms of payment is sufficient to ensure adequate customer service and that "based upon the practicalities of the circumstances, public policy considerations dictate that the Commission must require WGL to preserve the company's existing level of service to customers."

On April 21, 2003, WGL filed an application for reconsideration of Order No. 12688, stating for the first time that "facts surrounding the Company's proposed closing of Anacostia were in dispute." These disputed facts purportedly included the harm or benefit the proposed closing would have on customers, the availability of alternative payment facilities available to customers in the Anacostia community, and the viability of other payment options to customers. WGL argued that because facts in this case were disputed, the Commission was required to conduct evidentiary hearings to properly adjudicate all issues surrounding the closing and not the legislative-type community hearings conducted by the Commission. WGL continued to argue that the Commission's order was not supported by substantial evidence, and that the Commission's regulatory authority under D.C.Code §§ 1–204.93, 34–901, 34–908, and 34–914 (2001) did not encompass the regulation of management's business and operational decisions.

On May 30, 2003, the Commission denied WGL's second application for reconsideration. *See* Comm'n Order No. 12756 (May 30, 2003). The Commission rejected WGL's request for an evidentiary-type hearing on the ground that the issue pre-

sented concerned a policy decision. In addition, the Commission explained that a substantial record had been compiled and that the impact upon the community outweighed the economic considerations raised by the Company. Specifically, the Commission found that although WGL proposed other locations and a variety of methods of payment—including mail, phone, Main Office, two banks, credit cards, Western Union, and Internet— these alternatives were not truly viable options for a great number of customers in the community served by the Anacostia service center. First, the Commission noted that two of the banks mentioned as payment locations were not viable options to Anacostia customers because SunTrust Bank would no longer accept payments from WGL customers, and First Virginia Bank has no branches located within the District of Columbia.[2] Second, the Commission expressed concern that the options that WGL suggested for telephone and Internet payments are not accessible

to a great number of customers in the relevant community who do not have Internet access, bank accounts, or credit cards. Third, the Commission noted that additional costs were associated with several of these payment options and that these alternatives addressed only payments, but failed to provide customers with other services, such as access to their account information. As a result, the Commission concluded that these alternative payment options were inadequate to maintain the level of customer service provided by the Anacostia service center.

Before this court, petitioner argues that the Commission's Orders Nos. 12688 and 12756 are unsupported by substantial evidence as required by the District of Columbia Administrative Procedure Act ("DCAPA"). *See* D.C.Code §§ 2–509(e)[3] & 34–908 (2001).[4] Petitioner additionally contends that in reaching its decision, the Commission conducted a legislative process that deprived the Company of its procedural due process right to adjudica-

---

**2.** Although not expressly mentioned by the Commission, the record shows that Farmers Bank of Maryland also does not have any branches in the District of Columbia.

**3.** Section 2–509(e) states:

Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence. A copy of the decision and order and accompanying findings and conclusions shall be given by the Mayor or the agency, as the case may be, to each party or to his attorney of record.

**4.** Section 34–908 provides:

Upon its own initiative or upon reasonable complaint made against any public utility that any of the rates, tolls, charges,

or schedules, or *services*, or time and conditions of payment, or any joint rate or rates, schedules, or *services*, are in any respect unreasonable or unjustly discriminatory, or that any time schedule, regulation, or act whatsoever affecting or relating to the conduct of any street railway or common carrier, or the production, transmission, delivery, or furnishing of heat, light, water, or power, or any service in connection therewith, or the conveyance of any telegraph or telephone message, or any service in connection therewith, is in any respect unreasonable, insufficient, or unjustly discriminatory, or that any service is inadequate or cannot be obtained, the Commission may, in its discretion, proceed, with or without notice, to make such investigation as it may deem necessary or convenient of any public utility. But no order affecting said rates, tolls, charges, schedules, regulations, or act complained of shall be entered by the Commission without a formal hearing.

We have added the italicization for emphasis.

tion of disputed facts through an evidentiary hearing. Finally, petitioner asserts that the Commission's actions impermissibly interfered with management's operational decisions.

## II. STANDARD OF REVIEW

■■■ Our review of a Commission order is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless ... such findings ... are unreasonable, arbitrary, or capricious." D.C.Code § 34–606 (2001);[5] *see, e.g., United States v. D.C. Pub. Serv. Comm'n,* 465 A.2d 829, 832 (D.C.1983). In reviewing a Commission order, we must determine whether its overall effect is "just and reasonable," *People's Counsel v. D.C. Pub. Serv. Comm'n,* 455 A.2d 402, 403 (D.C. 1982) (discussing review of ratesetting orders) (citation omitted); *Washington Pub. Interest Org. v. D.C. Pub. Serv. Comm'n,* 393 A.2d 71, 76 (D.C.1978) (same), and whether the Commission "has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations." *Washington Metro. Area Transit Auth. v. D.C. Pub. Serv. Comm'n,* 486 A.2d 682, 685 (D.C.1984) (citations omitted). Our deferential review means that an agency's findings of fact that are supported by substantial evidence will be sustained "even if there is substantial evidence in the record to support contrary findings." *Metro. Police Dep't v. Baker,* 564 A.2d 1155, 1159 (D.C.1989) (citation omitted). And importantly, public policy decisions made by the Commission are "beyond both the jurisdiction and the competence of a reviewing

court." *Washington Metro. Area Transit Auth.,* 486 A.2d at 692. To facilitate judicial review of its orders, the Commission must explain "fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry." *Washington Gas Light Co. v. D.C. Pub. Serv. Comm'n,* 450 A.2d 1187, 1193 (D.C.1982) (quoting *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). The party seeking to reverse an order of the Commission bears the burden of demonstrating that the order is "unreasonable, arbitrary, or capricious," D.C.Code § 34–606, by demonstrating "clearly and convincingly a fatal flaw in the action taken." *Bell Atl.—Washington, D.C., Inc. v. Pub. Serv. Comm'n,* 655 A.2d 1231, 1233 (D.C. 1995) (citation omitted).

## III. ANALYSIS

### A. Jurisdiction

■■ Before we turn to the merits, we must address the issue of reviewability. The Commission asserts that this matter is not reviewable by this court because its decision to deny WGL's proposal to close the Anacostia service center is a policy decision "beyond the jurisdiction of a reviewing court." *See Washington Metro. Area Transit Auth.,* 486 A.2d at 692. We do not agree. In denying WGL's proposal to close the Anacostia customer service center, the Commission issued an order after analyzing the law and examining the facts and evidence presented. On appeal, petitioner asserts that the Commission acted without authority, impermissibly in-

---

**5.** Section 34–606 provides:

In the determination of any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

terfered in WGL's management decisions regarding its operations, denied it procedural safeguards, and reached conclusions that are unsupported by substantial evidence. Given that petitioner's challenges to the Commission's order present questions of law—not policy decisions—this court has jurisdiction to determine whether the Commission's actions are authorized, procedurally sound, and supported by the record. *See* D.C.Code § 34–606.

## B. Public Service Commission's Statutory Authority

■ Petitioner contends that the Commission exceeded its statutory authority by investigating and then rejecting WGL's decision to close its service center facility in Anacostia because the statute does not authorize the Commission to "exercise dominion and control over the Company's management decisions." Specifically, petitioner argues that the enabling statute for the Commission, D.C.Code § 1.204.93,[6] authorizes the Commission to regulate public utilities, "but does not confer the broad grant of authority envisioned by the Commission's order over management decisions, including the closure, opening or operation of any of the Company's facilities." WGL contends that while D.C.Code § 34–908 provides the Commission with authority to conduct investigations of the rates and services provided by a regulated

utility, it does not give the Commission authority to "unilaterally [ ] foreclose a business decision by the Company's management" because "[t]he operation of the Company's facilities is within the decision making control of the Company, not the Commission."

We conclude that the Commission's statutory power encompasses the actions taken in this case. Various provisions of the statute grant the Commission authority to regulate all aspects of public utility rates and services. Under § 34–908, the Commission "[u]pon its own initiative" and "in its discretion" may investigate public utility services, including "time and conditions of payment," which it believes are "in any respect unreasonable or unjustly discriminatory." In addition, § 34–914 states that the Commission may investigate "[w]henever the Commission shall believe that . . . any reasonable service is not supplied by a public utility."[7] Pursuant to D.C.Code § 34–215 (2001), "service" is defined "in its broadest and most inclusive sense,"[8] which would include WGL customers' ability to access the Company's services, among them account information and payment options. Thus, we conclude that the Commission had statutory authority to investigate and regulate WGL's decision to close its Anacostia customer service center.

**6.** Section 1–204.93 provides:

There shall be a Public Service Commission whose function shall be to insure that every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable. The charge made by any such public utility for any facility or services furnished, or rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory. Every unjust or unreasonable or discriminating charge for such facility or service is prohibited and is hereby declared unlawful.

**7.** Section 34–914 provides:

Whenever the Commission shall believe that any rate or charge of any public utility may be unreasonable or unjustly discriminatory, or that any reasonable service is not supplied by a public utility, or that an investigation of any matter relating to any public utility should for any reason be made, it may, on its own motion, summarily investigate the same with or without notice.

**8.** Section 34–215 provides: "The term 'service' is used in this subtitle in its broadest and most inclusive sense."

## C. Procedural Due Process

 Petitioner asserts that the Commission's failure to conduct an evidentiary hearing violated the Company's statutory and constitutional procedural due process rights. In support of its argument, petitioner relies on § 34–908, which provides that

the Commission may, in its discretion, proceed, with or without notice, to make such investigation as it may deem necessary or convenient of any public utility. But no order affecting said rates, tolls, charges, schedules, regulations, or act complained of shall be entered by the Commission without a formal hearing.

*See also Richard Milburn Pub. Charter Alternative High School v. Cafritz,* 798 A.2d 531, 541 (D.C.2002) (stating that a two-part inquiry must be conducted in order to determine whether a contested case hearing is constitutionally mandated before the government revokes a charter); *Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n,* 378 A.2d 1085, 1091 (D.C. 1977) (holding that the statute "requires a formal hearing [ ] when the Commission proceeds upon its own initiative"). Petitioner asserts that because the facts surrounding the Company's proposed closing of the Anacostia service facility were in dispute, the "formal hearing" required by the statute should have been an evidentiary hearing, not the legislative-type community hearings held by the Commission. *See Chevy Chase Citizens Ass'n v. District of Columbia Council,* 327 A.2d 310, 314 (D.C.1974) (distinguishing between "quasi-judicial" and "quasi-legislative" hearings); *see also Milburn,* 798 A.2d at 540–44 (describing when a contested hearing is required by the DCAPA or the Fifth Amendment's Due Process Clause). Even if we assume that petitioner's argument has

merit, it is not a basis to reverse the Commission's order. First, a review of the record shows that although WGL now asserts that it was entitled to an evidentiary hearing, it did not make a timely request for such a hearing before the Commission. As the Commission noted,

WGL in its Original Reconsideration Application did not seek an evidentiary hearing, but did request that the Commission expedite this matter. In an effort to chart a course of action adopted for the sake of expediency as requested by WGL, the Commission reviewed the entire record in this matter and determined that the proposed closing of the Anacostia Office would clearly diminish the quantity and quality of essential services that the company provides to District residents.

Comm'n Order No. 12756 at 9, ¶ 16.[9]

Second, the record also reveals that petitioner did not avail itself of the opportunity to present evidence or question witnesses during either of the public hearings. Instead, in a letter dated January 31, 2003, WGL informed the Commission that it wished to clarify its position with respect to attendance at the public hearings by stating that "[t]he Company believes it is preferable not to offer a statement at Community Hearings but rather to listen at these hearings to its customers and other interested persons." Nor has WGL indicated on appeal that it has a factual basis to contest the testimony presented at the hearings or the evidentiary facts relied upon in the Commission's order. In light of WGL's previously expressed desire to expedite the process and its failure to avail itself of the opportunity to contest the evidence presented during the public hearings, we cannot say that the Commission

---

**9.** In its answer to OPC's petition to intervene, WGL explained that "[a]s stated by the Company in its request for an expedited process,

there simply is no need for this matter to be prolonged through lengthy briefing schedules and hearing."

acted arbitrarily in rejecting WGL's belated request for an evidentiary hearing made in its motion for reconsideration.

## D. Substantial Record Evidence

██ Petitioner contends that the Commission's order lacks substantial evidence in the record to support the findings of fact and conclusions of law rendered in its decision. Specifically, WGL asserts that the Commission reached its decision based on a deficient record that does not take into account disputed facts such as 1) the harm or benefit the proposed closing would have on customers; 2) the availability and viability of alternative payment arrangements for the Anacostia community; and 3) WGL's authority to make business decisions regarding the operation of its facilities. Petitioner, however, fails to explain which specific, relevant facts are in dispute that undermine the substantial basis for the Commission's finding. For example, although WGL asserts that the harm or benefit the proposed closing would have on customers is in dispute, it fails to specify which facts used by the Commission to support its conclusion are factually incorrect. In reaching its conclusion, the Commission determined that the closure of the Anacostia service center would be harmful to customers in that community because the alternative payment locations offered by WGL would be of limited use to Anacostia residents given that one of the suggested banking alternatives, SunTrust Bank, would no longer accept payments after March 31, 2003, and that the other banks that could serve as alternative payment locations have no branches located within the District of Columbia. In discussing the viability of other payment options, the Commission noted that evidence presented during the public hearings showed that the options suggested by WGL for paying by phone or through the Internet are not available to a great number of customers in the commu-

nity who do not have bank accounts, credit cards, or access to the Internet. Nothing in the record suggests that WGL disputes any of these facts. Moreover, the Commission observed that in its submission, WGL indicated that there are additional costs to customers who use several of the payment alternatives. The Commission explained that "these additional costs associated with bill payment were a disincentive for the Commission to approve the closing of the Anacostia Office." Finally, the Commission noted that WGL indicated that customers availing themselves of the alternative payment locations and options would not have access to pertinent customer information about their accounts for payment purposes or otherwise. This limitation concerned the Commission, which preferred that "customers, when making payments at a payment center, should have available to them customer information to enable them to be informed when transacting business." As a result, the Commission concluded that the "[f]ailure of WGL to provide alternative payment options that allow customers to be informed of the status of their accounts is wholly inadequate." Based on our review of the record, the Commission findings are supported by substantial evidence—which has not been disputed by petitioner—and its consequent decision to deny WGL's proposal to close the Anacostia service center is not arbitrary or capricious and appears, overall, to be just and reasonable based on the facts developed during its investigation. Thus, we see no reason to disturb the Commission's findings and ultimate conclusions.

*Affirmed.*