214 F.3d 1366 (D.C. Cir. 2000)
 Central Vermont Public Service Corporation, Petitioner
v.
Federal Energy Regulatory Commission, Respondent
Vermont Department of Public Service, Intervenor
 No. 98-1532
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued December 2, 1999
Decided June 30, 2000
 
 On Petition for Review of Orders of the Federal Energy Regulatory Commission
 Carmen L. Gentile argued the cause for petitioner. With him on the briefs were David E. Goroff and James H. McGrew.
 Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.
 Before: Edwards, Chief Judge, Henderson and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Tatel.
 Tatel, Circuit Judge:
 
 
 1
 For years Central Vermont Public Service Corporation has sold electricity to its wholly owned subsidiary, Connecticut Valley Electric Company, which has resold the electricity to retail customers in New Hampshire. After ordering Connecticut Valley to terminate its power purchase agreement with Central Vermont, the New Hampshire Public Utility Commission denied Connecticut Valley's request to recover stranded costs from its own retail customers. Central Vermont then petitioned the Federal Energy Regulatory Commission for approval of a transmission rate surcharge that would permit Central Vermont to recover stranded costs from Connecticut Valley's retail customers. Finding the proposed surcharge inconsistent with its stranded cost policy, FERC rejected the surcharge. Because we find FERC's decision neither arbitrary nor capricious, we deny the petition for review.
 
 
 2
 * In order to stop utilities from discriminatorily denying other power suppliers access to their transmission lines, the Federal Energy Regulatory Commission, acting through what is known as Order 888, required public utilities that own, control, or operate transmission facilities to file open access tariffs under which they agree to provide transmission service according to certain minimum terms and conditions. See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, FERC Stats. & Regs.p 31,036, 61 Fed. Reg. 21,540 (1996), clarified, 76 FERC p 61,009 and 76 FERC p 61,347 (1996), modified, Order No. 888-A, FERC Stats. & Regs. p 31,048, 62 Fed. Reg. 12,274 (1997), order on reh'g, Order No. 888-B, 81 FERC p 61,248, 62 Fed. Reg. 64,688 (1997), order on reh'g, Order No. 888-C, 82 FERC p 61,046 (1998). Recognizing that utilities might incur transition costs--so-called "stranded costs"--as a result of former customers' new ability to reach alternate power suppliers through FERC-mandated open access, as well as through parallel actions on the state level, Order 888 provides for both wholesale and retail stranded cost recovery.
 
 
 3
 Wholesale stranded costs result when wholesale utility customers (customers who purchase power for resale) take advantage of Order 888's open access requirement to purchase power from another supplier using their former utility's transmission lines. Under the pre-open access regulatory regime, the Commission explained, utilities entered into long term contracts for the wholesale sale of power to requirements customers. Because wholesale customers had no source of power supply other than their historic utility, these contracts were normally extended at the end of their term. Relying on the expectation of continued service to historic customers, utilities invested money, built facilities, and entered into long-term fuel purchase contracts. See Notice of Proposed Rulemaking, Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, FERC Stats. & Regs. p 32,507 at 32,863-64, 59 Fed. Reg. 35274 (1994). These costs will become "stranded" if, before utilities have recovered them, their long-term requirements customers take advantage of open access and cease purchasing the utilities' power. Recognizing that FERC "cannot change the rules of the game without providing a mechanismfor recovery of the costs caused by such regulatory-mandated change," Order 888-A, p 31,048 at 30,346, Order 888 provides a mechanism for utilities to recover stranded costs caused by the departure of wholesale customers.
 
 
 4
 Retail stranded costs occur when retail customers take advantage of state-ordered retail "wheeling" (i.e., state ordered transmission of power by utilities for other power suppliers) to purchase power from suppliers other than their historic utilities. Because these costs result from state regulation, FERC agreed to consider utility proposals to recover stranded costs from retail customers only if the appropriate state regulatory commission lacks authority to do so under state law. See Order 888, p 31,036 at 31,824-26.
 
 
 5
 In Transmission Access Policy Study Group v. FERC, No. 97-1715 (D.C. Cir. 2000), also issued today, we uphold Order 888's stranded cost policy in all respects relevant to this case.
 
 
 6
 In this case, Central Vermont seeks to use Order 888 to recover stranded costs from the retail customers of its wholesale requirements customer, Connecticut Valley. A wholly owned subsidiary of Central Vermont, Connecticut Valley purchases power from Central Vermont pursuant to a wholesale requirements contract (the "RS-2 contract") and then resells the power to retail customers in New Hampshire. As part of state-wide electric utility restructuring, the New Hampshire Public Utility Commission ("NHPUC") ordered Connecticut Valley to terminate the RS-2 contract so that its customers could take advantage of state-ordered retail wheeling to reach other power suppliers. In response, Connecticut Valley petitioned the NHPUC to recover its stranded costs from its retail customers in New Hampshire. Concluding that Connecticut Valley was in part responsible for these costs because it had imprudently declined to terminate the RS-2 contract when the retail restructuring program was enacted into law in 1996, the NHPUC denied its request.
 
 
 7
 Central Vermont then filed with FERC a notice of cancellation of the RS-2 contract. Claiming that cancellation of the contract would produce $44.9 million of stranded costs, and relying on Order 888, Central Vermont sought to recover those costs through a surcharge to the transmission rate charged to customers who use Central Vermont's transmission system to deliver power to customers in Connecticut Valley's service area. In other words, the surcharge collected by Central Vermont would be paid by Connecticut Valley's retail customers and the entities transmitting power to them. Central Vermont explained: "In this way, the stranded costs would be paid by the same persons who caused the cost stranding to occur by displacing, through use of Central Vermont's transmission system, Central Vermont power with power acquired from a different supplier."
 
 
 8
 Without holding a hearing, FERC rejected Central Vermont's proposed transmission surcharge, explaining that Order 888 permits utilities to recover stranded costs only from wholesale customers--in this case Connecticut Valley--not from retail customers of their wholesale customers. Central Vermont Public Service Corp., 81 FERC p 61,336 at 62,54142 (1997). FERC recommended that Central Vermont seek recovery of its stranded costs directly from Connecticut Valley through an exit fee amendment to the RS-2 contract. See id. at 62,542. Although Central Vermont followed that advice and filed a proposed exit fee amendment--a hearing on that proposal is pending, see Central Vermont Public Service Corp., 82 FERC p 61,237 (1998)--it also sought rehearing, claiming that an exit fee would be unsatisfactory and challenging FERC's rejection of its surcharge proposal. See Central Vermont Public Service Corp., 84 FERC p 61,295 (1998). In the alternative, asserting that FERC's rejection of the surcharge rendered its transmission rates confiscatory, it argued that FERC should have either treated its surcharge proposalas a section 205 rate increase filing or waived its stranded cost regulations altogether. FERC rejected Central Vermont's challenges, finding the last two unripe in light of the pendency of Central Vermont's exit fee proposal. See id.
 
 
 9
 Central Vermont now petitions for review. It argues that its transmission surcharge proposal fits within three situations in which FERC agreed to consider proposals for stranded cost recovery on a case-by-case basis. First, it claims that its proposal is analogous to the "retail-turned-wholesale" scenario, in which Order 888 permits utilities to recover stranded costs from newly formed municipalities who serve the utilities' former retail customers. See Order 888, p 31,036 at 31,818. Second, asserting that the RS-2 contract contains a reserve equalization formula, Central Vermont argues that FERC should have permitted it to recover stranded costs pursuant to Order 888's provisions concerning situations where costs are shifted across state lines. See id. at 31,826.Finally, it invokes Order 888's provisions for the recovery of stranded costs that result from restructuring, see id. at 31,845-46; according to Central Vermont, it is voluntarily restructuring in response to NHPUC-ordered retail wheeling. Central Vermont also claims that FERC's refusal to treat its filing as a section 205 rate increase filing or to waive its regulations was arbitrary and capricious.
 
 II
 
 10
 We review FERC's orders under the APA's familiar arbitrary and capricious standard. See 5 U.S.C. 706(2)(A);Williams Field Services Group, Inc. v. FERC, 194 F.3d 110, 115 (D.C. Cir. 1999). Of particular importance to this case, we "afford substantial deference to the Commission's interpretations of its own regulations, deferring to the agency unless its interpretation is plainly erroneous or inconsistent with the regulation." Bluestone Energy Design, Inc. v. FERC, 74 F.3d 1288, 1292 (D.C. Cir. 1996) (internal quotation marks omitted).
 
 
 11
 At oral argument, counsel for Central Vermont emphasized that Central Vermont relies not on Order 888's implementing regulations, see 18 C.F.R. 35.26, but rather on Order 888 itself, which identifies certain situations not covered by the regulations in which FERC will consider proposals for stranded cost recovery on a case-by-case basis. This was a wise strategy, for Central Vermont's transmission surcharge proposal does not conform to the Order 888 regulations, which authorize recovery of stranded costs from wholesale requirements customers (in this case, Connecticut Valley), not those customers' retail customers. The regulations provide that FERC will consider proposals for recovery of stranded costs from a utility's retail customers, but only when the state regulatory commission lacks authority to do so. See id. 35.26(d)(1). Not only does the NHPUC have authority to address stranded costs (and did in fact do so), but the retail customers from whom Central Vermont seeks recovery are not its customers--they're Connecticut Valley's.
 
 
 12
 Central Vermont's attempts to fit its transmission surcharge proposal into Order 888 rest on a misunderstanding of the order. Take, for example, Central Vermont's effort to analogize its plight to situations where a municipality condemns a utility's distribution plant, becomes a wholesale customer of the utility, and utilizes open access transmission to purchase power on the competitive market. In that scenario, known as retail-turned-wholesale, FERC reasoned that the municipality, as a new wholesale customer, stands in the shoes of former retail customers for purposes of obtaining transmission access and new power supplies. Because of this direct link between former retail customers and the municipality, FERC agreed to consider utility proposals for recovery of stranded costs from the municipality itself. Order 888-A, p 31,048 at 30,408-10.
 
 
 13
 According to Central Vermont, Connecticut Valley's former retail customers, like newly created municipalities, are not technically former wholesale customers, but are using Central Vermont's transmission system to supply the very loads for which Central Vermont incurred the now-stranded costs. That analogy doesn't work. In the retail-turned-wholesale situation, retail customers were former customers of the utility seeking recovery. Here, the retail customers from whom Central Vermont seeks recovery are former customers of Connecticut Valley. Under the retail-turned-wholesale analogy, Connecticut Valley, not Central Vermont, would be seeking recovery from these customers. Moreover, because Connecticut Valley's customers remain retail customers, the proper forum for stranded cost recovery is, as Connecticut Valley seems to have recognized, the NHPUC, not FERC. Not until the NHPUC denied Connecticut Valley's original request for stranded cost recovery did Central Vermont turn to FERC.
 
 
 14
 Equally unsuccessful is Central Vermont's effort to fit itself into Order 888's stranded cost provisions for multi-state and restructuring situations. Its arguments amount to little more than attempts to fit square pegs into round holes, for in neither circumstance did FERC agree to consider proposals to recover stranded costs from retail customers of a utility's wholesale customer.
 
 
 15
 We begin with the multi-state exception. Concerned that the "denial of retail stranded cost recovery by a state regulatory authority could, through operation of the reserve equalization formula in a Commission-jurisdictional intra-system agreement, inappropriately shift the disallowed costs to affiliated operating companies in other states," FERC agreed to consider stranded cost recovery in such situations on a case-by-case basis. Order 888, p 31,036 at 31,826. Claiming that its RS-2 contract with Connecticut Valley contains just such a "reserve equalization formula," Central Vermont argues that its inability to recover stranded costs from Connecticut Valley's New Hampshire retail customers will, through the formula's operation, shift costs to its Vermont customers. FERC rejected this claim, concluding that the RS-2 contract in fact contains no reserve equalization formula.
 
 
 16
 At oral argument, the parties continued to disagree about whether the RS-2 contract actually contains a reserve equalization formula. Insisting that it does, counsel for Central Vermont pointed us to the contract's "capacity charge formula." Counsel for FERC told us that the capacity charge formula is not the same as a reserve equalization formula; to illustrate his point, he simply referred us to an inter-system agreement (not in the record of this proceeding) that he says contains such a formula.
 
 
 17
 Fortunately, we can decide this case without resolving this debate, for even if the RS-2 contract contains a reserve equalization formula, FERC did not err in concluding that Central Vermont's surcharge proposal did not fit within the multi-state exception. Order 888's sole method for avoiding the automatic shifting of costs across state lines is a contract amendment. See Order 888, p 31,036 at 31,826; Order 888-A, p 31,048 at 30,420. See also Central Vermont, 84 FERC at 62,371 ("[T]he remedy for preventing automatic shifting of retail stranded costs was to amend the jurisdictional contract on file with the Commission."). Central Vermont seeks not to amend the RS-2 contract, but rather to recover stranded costs from its customer's customers.
 
 
 18
 For its final effort to fit its surcharge proposal into Order 888, Central Vermont relies on provisions permitting recovery of stranded costs resulting from voluntary restructuring. Order 888 said little more than this about voluntary restructuring:
 
 
 19
 [T]he functional unbundling of wholesale services does not require corporate unbundling (such as disposition of assets to a non-affiliate, or establishing a separatecorporate affiliate to manage a utility's transmission assets). At the same time, we indicated that some utilities may ultimately choose some form of corporate unbundling. We reaffirm in this Final Rule that we are willing to consider case-specific proposals for dealing with stranded costs in the context of any restructuring proceedings that may be instituted by individual utilities.
 
 
 20
 Order 888, p 31,036 at 31,845-46 (footnote omitted).
 
 
 21
 Citing New Hampshire's restructuring of the retail electricity market and its own "inevitable" need to divest generation assets, Central Vermont claims that FERC should have approved its surcharge proposal as arising in connection with a voluntary restructuring. FERC refused to do so, finding that Central Vermont had not demonstrated that it was pursuing corporate unbundling of the type contemplated by Order 888.Participation in state-wide restructuring, FERC reasoned, was insufficient to constitute a "voluntary restructuring."See Central Vermont, 84 FERC at 62,372. Indeed, in the only two proceedings cited by the parties in which FERC has set hearings to consider stranded cost proposals in the restructuring context, utilities had proposed to sell off specific assets and to modify their contracts with wholesale requirements customers. See Montaup Electric Co., 79 FERC p 61,386 (1997); New England Power Co., 78 FERC p 61,080 (1997). Central Vermont has said only that it will "inevitably" divest assets. More fundamentally, the stranded cost proposals at issue in the two cited cases required recovery from wholesale customers, not from retail customers of wholesale customers. Were we to accept Central Vermont's claim, then every utility denied stranded cost recovery in connection with state-ordered restructuring could seek relief from FERC. Yet Order 888 emphatically and repeatedly states that "[t]he only circumstance in which we will entertain requests to recover stranded costs caused by retail wheeling is when the state regulatory authority does not have authority under state law to address stranded costs when the retail wheeling is required." Order 888, p 31,036 at 31,825 (footnote omitted).
 
 
 22
 To sum up, we see no basis for questioning FERC's rejection of Central Vermont's surcharge proposal, much less for finding the agency's action arbitrary or capricious. As we read the record in this case, Central Vermont simply did not like the consequence of Order 888's deference to state agencies--the NHPUC's denial of Connecticut Valley's retail stranded cost recovery proposal--and now seeks from FERC what the state agency denied. Nothing in Order 888 permits such an end run around FERC's decision to defer to state agencies' assessments of retail stranded cost recovery. Order 888 allows Central Vermont to recover stranded costs only from a wholesale requirements customer--here, its wholly owned subsidiary Connecticut Valley--just the course it is now pursuing in another proceeding.
 
 III
 
 23
 This brings us finally to Central Vermont's alternative claim that without stranded cost recovery, its current transmission rates are confiscatory and that FERC should therefore have either treated its transmission surcharge filing as a section 205 rate increase filing or waived its stranded cost regulations and approved the proposed surcharge. Citing the pendency of the exit fee amendment hearing, FERC rejected both claims. See Central Vermont, 84 FERC at 62,369 & n.7.
 
 
 24
 FERC now contends that Central Vermont's claims are unripe, relying on the familiar two-part test of ripeness: courts must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967). "A claim is not ripe for adjudication," the Supreme Court recently explained, "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296,118 S. Ct. 1257, 1259 (1998) (internal quotation marks and citations omitted). Central Vermont's challenge to FERC's refusal to treat its filing as a section 205 rate increase filing or to waive its regulations depends on no future events, contingent or otherwise. To resolve its challenge, we need only examine the record before us and assess FERC's rationale. To be sure, FERC's own decision may have rested in part on the existence of contingent events-namely, the resolution of the pending exit fee amendment proposal--but that does not make Central Vermont's challenge unripe in this court.
 
 
 25
 On the merits, we can easily dispose of Central Vermont's arguments. We see no basis for questioning FERC's judgment that whether and to what extent to permit Central Vermont to increase its rates in a section 205 proceeding depend on the outcome of the exit fee proposal. After all, if Central Vermont recovers its full stranded costs through the exit fee, it will have no need to increase its rates. Moreover, FERC made its decision "without prejudice to Central Vermont making a filing in the future seeking recovery of non-open-access-related costs." Central Vermont, 84 FERC at 62,369 n.8. If Central Vermont is unhappy with the outcome of the exit fee hearing, it may renew its claim.
 
 
 26
 We have the same reaction to Central Vermont's argument that FERC should have waived the Order 888 regulations. Given the possibility that Central Vermont may recover its full stranded costs through an exit fee--a method perfectly consistent with the regulations--FERC's refusal to waive its regulations is hardly arbitrary or capricious.
 
 IV
 
 27
 The petition for review is denied.
 
 
 28
 So ordered.