*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-AA-0987

POTOMAC ELECTRIC POWER COMPANY, PETITIONER,

v.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA, RESPONDENT,

and

OFFICE OF THE PEOPLE'S COUNSEL, INTERVENOR.

Petition for Review of Orders of the
Public Service Commission of the District of Columbia
(FC-1156-23)

(Argued March 6, 2024                                    Decided August 1, 2024)

*Dennis P. Jamouneau*, with whom *Anne Bancroft*, *Kimberly A. Curry*, *Taylor W. Beckham*, *Kunle Z. Adeyamo*, *Sherry F. Bellamy*, *Nicholas S. Penn*, and *Eric J. Murdock* were on the brief, for petitioner Potomac Electric Power Company.

*Brian O. Edmonds*, with whom *Christopher G. Lipscombe*, *Angela L. Lee*, *Kimberly Lincoln-Stewart*, and *Robert A. Weishaar, Jr.* were on the brief, for respondent Public Service Commission of the District of Columbia.

*Scott H. Strauss*, with whom *Sandra Mattavous-Frye* and *Amanda C. Drennen* were on the brief, for intervenor Office of the People's Counsel for the District of Columbia.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Petitioner Potomac Electric Power Company ("Pepco") challenges the determination of the Public Service Commission of the District of Columbia (the "Commission") precluding Pepco from recovering from rate-paying customers Pepco's pre-2018 costs incurred in connection with an investigation into environmental conditions at Pepco's Benning Road facility. We vacate and remand for further proceedings.

## I. Factual and Procedural Background

Except as noted, the following basic facts appear to be undisputed. Pepco operates the Benning Road facility, which occupies an approximately seventy-seven-acre site in the District of Columbia, bordering the Anacostia River. Approximately twenty percent of the site was once occupied by a Pepco electrical generating station. The generating station ceased operations in 2012 and was subsequently demolished. Most of the site is now occupied by a service center engaged in activities related to the construction, operation, and maintenance of Pepco's electric-power transmission and distribution system.

In 1999, Pepco applied to the Commission for approval to divest its generation assets. Pepco reached a settlement with the parties to that proceeding, and the Commission approved the settlement. The settlement agreement provided that if Pepco decided not to sell the Benning Road generating station, Pepco would be

barred from recovering "stranded costs associated with" that generating station. "Stranded costs" are infrastructure investments that a utility is unable to recover due to changes in regulatory or market conditions. *See, e.g.*, *Cent. Vt. Pub. Serv. Corp. v. Fed. Energy Regul. Comm'n*, 214 F.3d 1366, 1367-68 (D.C. Cir. 2000) (describing different varieties of stranded costs).

In 2008, a contractor working for the United States Environmental Protection Agency ("EPA") assessed the Benning Road site to determine whether action needed to be taken on the site pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. The contractor reviewed the history of the site, physically examined the site, and took soil and water samples on a specific date.

The contractor's subsequent report noted that Pepco had conducted generation and distribution activities on the site. The report described "numerous known spills and leaks" of polychlorinated biphenyls ("PCBs")—a contaminant of concern—at the Benning Road site. Some of those known spills and leaks appear to have arisen from generation activities and some appear to have arisen from distribution/transmission activities. For some known spills and leaks, the nature of the activity causing the spill is not clear from the description in the report.

The report explained that high levels of PCB contamination were found in the Anacostia River downstream from the site. Although the site was properly managed at the time of inspection and PCB spills were addressed promptly, the report concluded that the PCB contamination of the Anacostia River was likely attributable to activities on the site. The report identified the "sludge dewatering area" adjacent to the former generation-station cooling towers as the only remaining potential "uncontained" source of contaminants to the environment at the site. The report indicated that the sludge dewatering area could "release [PCBs and other] compounds via overland flow . . . into the storm water system that eventually discharges into the Anacostia River." The report also noted, however, that other "historical releases of . . . hazardous substances from the site contributed to the contamination documented in [the] Anacostia River."

After the report was issued, the District of Columbia Department of the Environment, now known as the Department of Energy and Environment ("DOEE"), notified Pepco that it intended to sue Pepco for abatement of the hazardous conditions identified in the report. The DOEE notice letter asserted that the conditions DOEE sought to have abated resulted "from the disposal and management of solid wastes at [the Benning Road] facility," which the notice letter stated was "used by Pepco to manage all operations and maintain all equipment associated with its electrical distribution system." The letter cited six "documented

releases of PCBs" described in the EPA report as the basis for the intended lawsuit against Pepco. As previously noted, some of those known spills and leaks appear to be attributable to generation activities and some appear to be attributable to distribution/transmission activities.

In 2011, the District of Columbia sued Pepco and related companies seeking abatement of conditions and recovery of costs relating to environmental contamination on and near the Benning Road site. The complaint does not appear to be in the record before the Commission, but the complaint is described in a subsequent consent decree that is in the record. According to the consent decree, the complaint relied on the EPA report, referred to the six documented releases of PCBs, and alleged that "PCBs that have been released at the Facility over time may have migrated from the property into the sediment of the adjacent Anacostia River." In the consent decree, Pepco agreed to conduct a remedial investigation and feasibility study ("RI/FS") to inform future remedial actions at the Benning Road site.

The stated purposes of the consent decree included "determin[ing] the nature and extent of contamination and *any* threat to the public health, welfare, or the environment caused by the release or threatened release of hazardous substances, pollutants[,] or contaminants at or from the Facility, by obligating Pepco to conduct a remedial investigation," and "identify[ing] and evaluat[ing] alternatives for

remedial action (if any) to prevent, mitigate[,] or otherwise respond to or remedy *any* release or threatened release of hazardous substances, pollutants, or contaminants at or from the Facility, by obligating Pepco to conduct a feasibility study" (emphasis added). The consent decree described in some detail the nature of the required RI/FS. The study was to "form the basis for the District's selection of a remedial action for the Facility, and for the Anacostia River sediment associated with the Facility." The study was to be conducted so as to provide enough information to document, among other things, "whether releases of hazardous substances have occurred," "whether natural resources have been or are likely to have been adversely affected by the discharge or release of hazardous substances," and "whether the quantity and concentration of the released hazardous substances are sufficient to potentially cause injury to natural resources."

The consent decree provided that the RI/FS would be conducted as described in an attached "Scope of Work Outline." That outline does not appear to be part of the record before the Commission. Although the outline is attached to the consent decree, which was filed in federal district court, and is therefore a publicly available court record, we have not been asked to consider the outline and we therefore do not do so. *See generally, e.g., Yazam, Inc. v. D.C. Dep't of For-Hire Vehicles*, 310 A.3d 616, 628 (D.C. 2024) ("Our review . . . is limited to the evidence in the administrative record before the agency.") (internal quotation marks omitted).

In approving the settlement agreement, the federal district court judge explained that the complaint relied on six documented releases of PCBs at the facility and alleged that over time PCBs had seeped from the facility into the Anacostia River. The judge described the agreement as requiring Pepco "to conduct [an RI/FS] to study the conditions at the Facility and the adjacent areas of the river, to determine the link between the Facility and the PCBs in the river, and to assess clean-up options."

A draft "Remedial Investigation Report" ("draft RI report") was prepared in 2019. That 191-page document described the "Study Area" as the Benning Road site and the shoreline and sediments of the Anacostia River adjacent to and immediately downstream from the site. The remedial investigation was intended to "(a) characterize environmental conditions within the Study Area, (b) investigate whether and to what extent past or current conditions at the Site have caused or contributed to contamination of the River, [and] (c) assess current and potential risk to human health and the environment posed by conditions within the Study Area."

The draft RI report described extensive testing and analysis at over twenty locations on the site. PCBs and other contaminants were found in the soil at a number of tested locations, including in areas apparently used for generation activities and areas apparently used for distribution and transmission activities. The

draft RI report concluded that contaminants from the site might have moved from the site to the Anacostia River through storm drains. The draft RI report also concluded that protective measures might be needed in the future to prevent workers on the site from being exposed to contaminants in the soil or in vapors released from the soil.

With respect to the Anacostia River, the draft RI report concluded, among other things, that historical discharges from the site may have contributed to contaminants in the sediment of the river. The draft RI report further concluded that groundwater and stormwater discharges from the site were not currently a significant source of contamination.

The draft RI report indicated that a feasibility study should be conducted to evaluate potential remedial actions both for the site itself and for the sediments in the Anacostia River.

Also in 2019, Pepco applied to the Commission for authority to establish its distribution rates for 2020 to 2022. *Off. of the People's Couns. v. D.C. Pub. Serv. Comm'n*, 284 A.3d 1027, 1031 (D.C. 2022) ("*OPC*"). Pepco sought to include approximately $1.9 million of its RI costs incurred through December 31, 2017, in its calculation of the rates it would charge its distribution customers. *Id.* Pepco also

requested similar recovery of its RI costs incurred from January 1, 2018, through June 30, 2019, totaling approximately an additional $3 million. *Id.*

The Commission initially permitted Pepco to include RI costs incurred before 2018 and deferred Pepco's requests for post-2017 costs, to be considered in a future rate case. *OPC*, 284 A.3d at 1031. OPC filed a petition for review, and this court vacated and remanded. *Id.* at 1029. Specifically, this court held that under the 1999 settlement agreement mentioned earlier in this opinion, costs attributable to the Benning Road generating station could not be recovered. *Id.* at 1034. Noting that "[t]he exact scope of what costs may be attributed to the generating station is a complex and fact-intensive inquiry," the court remanded to the Commission with a direction to "provide a reasoned interpretation of the scope of the agreement." *Id.*

On remand, the Commission reversed its previous decision and concluded that all pre-2018 RI costs sought by Pepco were associated with generation activities, and therefore were unrecoverable by Pepco. The Commission explained that ruling as follows: "Although there were six leaks identified in the EPA report, the one that triggered the consent decree [wa]s directly connected to the generator's cooling towers and the cooling towers are not part of the distribution or transmission systems."

Pepco sought reconsideration of the Commission's order on three grounds. First, Pepco argued that the Commission had failed to comply with D.C. Code § 2-509(d), a provision of the District of Columbia Administrative Procedure Act ("DCAPA"). Under that provision, if a majority of the decisionmakers resolving a contested case "did not personally hear the evidence," the agency may not issue a final decision without first issuing a proposed decision, including findings of fact and conclusions of law, and giving the parties an opportunity to file exceptions and present argument. D.C. Code § 2-509(d). PEPCO argued that two of the three Commissioners who decided the case on remand had not been present at the pre-remand evidentiary hearing before the Commission.

Second, Pepco challenged the Commission's conclusion that the only potential PCB release that brought about the consent decree was the one associated with the sludge dewatering area identified in the EPA's report.

Finally, Pepco argued that the Commission had failed to comply with this court's directive to undertake a "complex and fact-intensive inquiry" into the proper allocation of RI costs as between generation activities and distribution/transmission activities. *OPC*, 284 A.3d at 1034.

The Commission denied reconsideration. On the procedural issue, the Commission suggested that D.C. Code § 2-509(d) was not applicable to the

proceedings on remand. The Commission also suggested that Commissioners' reading of paper filings might meet the requirement of "personally hear[ing] the evidence." Finally, the Commission stated that Pepco's opportunity to seek reconsideration of the Commission's order under D.C. Code § 34-604(b) "arguably" satisfied the requirements of D.C. Code § 2-509(d). On the last point, the Commission suggested that the reconsideration process contemplated under Section 34-604(b) "supersede[d]" the requirements of Section 2-509(d).

On the merits, the Commission described the EPA report as "finding that the sludge dewatering area contaminated the Anacostia River with PCBs." Because the sole uncontained source of PCBs was traced back to the cooling towers in Pepco's generation system, all of the RI costs were properly allocated to generation. The Commission therefore adhered to its prior decision that Pepco was not entitled to recover any of the RI costs at issue. On reconsideration, the Commission also referred to a 2020 Final Remedial Investigation Report ("Final RI report") that was not in the record before the Commission. Although the Commission and Pepco have at times considered or relied upon the Final RI report, the parties now appear to agree that the Final RI report should not be considered at this juncture. We agree. *See, e.g.*, *Yazam*, 310 A.3d at 628 (explaining that this court's review "is limited to the administrative record before the agency") (internal quotation marks omitted). We therefore do not consider that report.

## II. Allocation of RI Costs

Pepco challenges the Commission's determination that all of the RI costs at issue were attributable to generation activities and therefore unrecoverable. We agree with Pepco that the Commission's ruling cannot be upheld. We vacate and remand the case for further proceedings.

### A. Standard of Review

We defer to the Commission's findings of fact "unless it shall appear that such findings are unreasonable, arbitrary, or capricious." *Apartment & Off. Bldg. Ass'n v. Pub. Serv. Comm'n*, 203 A.3d 772, 777 (D.C. 2019) (quoting D.C. Code § 34-606) (ellipsis omitted). "[W]e must affirm" the Commission's orders "if there is substantial evidence to support the Commission's findings and conclusions and the Commission has given reasoned consideration to each of the pertinent factors." *Id.* (internal quotation marks omitted). We have said that "our review of the substance of the Commission's decisions is the narrowest judicial review in the field of administrative law." *Off. of the People's Couns. v. Pub. Serv. Comm'n*, 163 A.3d 735, 739 (D.C. 2017) (internal quotation marks omitted). We have also said, however, that we review the Commission's orders to determine "whether the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive

deliberations." *Washington Gas Light Co. v. D.C. Pub. Serv. Comm'n*, 856 A.2d 1098, 1104 (D.C. 2004) (internal quotation marks omitted). The latter description of the scope of our review seems indistinguishable from the standards we generally apply when reviewing agency action under the DCAPA. *See* D.C. Code §§ 2-510(3)(A), (D), and (E) (authorizing court to set aside agency action that is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of applicable procedural requirements, or "[u]nsupported by substantial evidence"). We need not attempt to clarify our standard of review in this case, however, because we conclude that the Commission's order must be vacated under any formulation of our scope of review. We also note that any deference to the Commission "is contingent on the Commission fully and clearly explaining what it does and why it does it." *OPC*, 284 A.3d at 1032 (brackets and internal quotation marks omitted).

## B. Analysis

In its initial order on remand, the Commission rested in part on an apparently factual conclusion: Although there was evidence of a number of PCB spills at the site, the consent decree was "triggered" by the one then-uncontained release, which was connected to generation activities. We view that factual conclusion as unsupported by substantial evidence. To the contrary, in our view there is

overwhelming evidence that spills (and more general concerns) not directly tied to generation activities played a substantial role in the complaint, the consent decree, and the scope of the actual RI that is reflected in the draft RI report. Specifically, the complaint apparently referred to a number of spills, not all of which were tied to generation activities; the consent decree required a broad investigation into the condition of the site as a whole; the draft RI report reflects a broad investigation into the condition of the site as a whole; and the draft RI report raises concerns about, and recommends a feasibility study of, parts of the site that do not seem specifically tied to generation activities. We see no adequate basis in the record for the Commission's apparent conclusion that if the EPA report had not identified the one then-uncontained source of PCBs, there never would have been a complaint, a consent decree, or an RI.

We also do not believe that the Commission's initial order adequately explained the legal framework for the Commission's decision. Under the terms of the settlement agreement, the Commission's task is to determine to what extent the RI costs at issue are or are not "associated with" the generation station. The Commission's initial order on remand appears to rest in part on the unstated legal premise that costs should be deemed "associated with" the generation station if activities at that station "triggered" (i.e., caused) those costs. But costs, like many other things, can have multiple causes. *See, e.g.*, *Lucas v. United States*, 240 A.3d

328, 341 (D.C. 2020) ("Often, events have multiple but-for causes.") (internal quotation marks omitted). It appears, for example, that some of the RI costs at issue were "triggered" by distribution/transmission activities, because those costs involved testing and analysis of areas where distribution/transmission activities had taken place and generating activities apparently had not. The Commission has not explained why costs apparently triggered by distribution/transmission activities should be treated as "associated with" the generating station.

On reconsideration, the Commission appears to have rested on a slightly different rationale, interpreting the 2009 EPA report as definitively determining that the sole uncontained source of PCBs as of the date of inspection was associated with generation activities. We view that rationale as insufficient.

Whatever the EPA report may have concluded about remaining uncontained PCB sources as of 2009, the RI study, both as contemplated by the consent order and as actually conducted, extended well beyond that issue. The Commission has not explained, and it is not obvious to us, why all of the costs of an RI study of the entire site should be allocated to generation simply because an initial report identified a generation-related leak as the sole ongoing threat of contamination.

We therefore must once again remand this case to the Commission for a more detailed analysis and explanation of a decision allocating RI costs between

generation activities and distribution/transmission activities. To be clear, we express no opinion at this juncture as to whether no RI costs, some RI costs, or all RI costs should be allocated to generation activities. Rather, we simply hold that the Commission's allocation must be adequately explained and supported.

We leave to the discretion of the Commission whether to reopen the record. On remand, the Commission may wish to consider, among other things, issues such as: (1) what areas at the site involved generation and distribution/transmission activities; (2) the nature and location of contamination sources on the site of which the parties were aware at the time of the consent order; and (3) the respective extents to which the RI study (and its resultant costs) in fact focused on areas associated with generation activities as opposed to distribution/transmission activities.

### III.  D.C. Code § 2-509(d)

As previously noted, Pepco argues that the Commission was required to first issue a proposed order on remand, because a majority of the Commissioners who ruled on remand were not present at the underlying evidentiary hearing in this case. Because this issue will presumably arise on remand, we choose to decide it. *See, e.g.*, *Ill. Farmers Ins. Co. v. Hagenberg*, 167 A.3d 1218, 1232 (D.C. 2017) (deciding "[s]everal issues likely to arise on remand"). We agree with Pepco. On remand, the Commission therefore must first issue a proposed order, with proposed findings of

fact and conclusions of law, and then must give the parties an opportunity to file exceptions and present argument. D.C. Code § 2-509(d).

## A. Standard of Review

This court generally reviews legal questions of statutory interpretation de novo. *District of Columbia v. ExxonMobil Oil Corp.*, 172 A.3d 412, 418 (D.C. 2017). We have generally accorded some deference "to the interpretation of a statute by the agency which is charged with its enforcement, and which therefore ordinarily has specialized expertise." *Booz Allen Hamilton Inc. v. D.C. Off. of Tax & Revenue*, 308 A.3d 1205, 1209 (D.C. 2024) (internal quotation marks omitted). In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the Supreme Court overruled prior decisions and held that such deference to agencies' interpretation of the law is impermissible under the federal Administrative Procedure Act. We have no occasion in this case to consider the possible implications of *Loper Bright* for our review of agency action under the DCAPA, because this court has already held that it owes no deference to the Commission with respect to the Commission's interpretation of and compliance with the DCAPA. *Washington Gas Energy Servs., Inc. v. D.C. Pub. Serv. Comm'n*, 893 A.2d 981, 986-87 (D.C. 2006).

"When interpreting statutes, we first look to see whether the statutory language at issue is plain and admits of no more than one meaning." *Booz Allen*

*Hamilton*, 308 A.3d at 1209 (brackets and internal quotation marks omitted). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id.* (internal quotation marks omitted). "We consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation." *Yazam*, 310 A.3d at 623 (internal quotation marks omitted).

## B. Analysis

The DCAPA "applies to proceedings before the Commission," and "any procedure established by the Commission must conform with the minimum requirements set forth in the [DCAPA]." *Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n*, 339 A.2d 710, 715 (D.C. 1975).

D.C Code § 2-509(d) provides:

> Whenever in a contested case a majority of those who are to render the final order or decision did not personally hear the evidence, no order or decision adverse to a party to the case . . . shall be made until a proposed order or decision, including findings of fact and conclusions of law, has been served upon the parties and an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of those who are to render the order or decision, . . . .

As previously noted, Pepco argues that two of the three commissioners who decided this case after our remand in *OPC* were not personally present to hear the

evidence at the underlying evidentiary hearing in the case. The Commission does not dispute that point.

Pepco further argues that the Commission was therefore required to issue a proposed order and permit the filing of exceptions to that order, rather than proceeding directly to issuance of a final order. We agree.

As a threshold matter, this court has already applied the requirements of Section 2-509 to a final order issued after a remand. *Sherman v. D.C. Comm'n on Licensure to Practice the Healing Art*, 476 A.2d 667, 669-71 (D.C. 1984). We did so, moreover, even though the agency in *Sherman* did not conduct further evidentiary hearings after remand but instead relied on the record that had previously been created. *Id.* We therefore do not agree with the Commission's argument that Pepco's right to the procedures of Section 2-509(d) depends on whether the Commission was required to hold further live evidentiary hearings on remand.

The principal remaining issue is whether decisionmakers "personally hear the evidence" only if they are present when live testimony is given. In our view, the plain language and ordinary meaning of Section 2-509(d) strongly support the conclusion that "personally hear[ing]" the evidence in a case means being present in person for the presentation of that evidence, as opposed to later reviewing a transcript of the evidence that was presented. (We have no occasion to consider the

application of this provision to hearings that are conducted remotely.) This court has repeatedly applied that interpretation of the term. *See, e.g.*, *Adgerson v. Police & Firefighters' Ret. & Relief Bd.*, 73 A.3d 985, 999 n.16 (D.C. 2013) (treating decisionmakers who did not attend evidentiary hearing as not having "personally hear[d]" evidence for purposes of Section 2-509(d)).

That reading is also supported by the available legislative history. Section 11 of the Revised Model State Administrative Procedure Act, on which Section 2-509(d) was based, contains different language from that included in the DCAPA. Section 11 of the Model Act refers to a majority of officials issuing a final order who "have not heard the case or read the record." Section 2-509(d)'s addition of the requirement that officials "*personally* hear the evidence" and omission of the alternative permitting officials to simply "read the record" clearly indicate that the DCAPA meant "personally hear" to exclude simple reading of the record. *See* Joseph P. Griffin, *The District of Columbia Administrative Procedure Act: Its History, Provisions, and Interpretation*, 61 Geo. L.J. 575, 598 n.171 (1973) ("[I]t is reasonable to assume that the drafters intended the [DCAPA] to be stricter in terms of ensuring mastery of the record than the drafters of the model legislation."). In sum, the DCAPA provides that where a majority of the agency decisionmakers did not personally hear the evidence, the parties must have an opportunity to interact with all of the decisionmakers before the agency issues a final decision. That

approach permits the parties to correct possible misconceptions or errors, to address concerns expressed in a proposed order, and to attempt to convince the agency before a final decision is rendered.

For these reasons, we are not persuaded by the Commission's contention that Section 2-509(d) is inapplicable as long as the Commissioners issuing the decision have reviewed and considered the evidence.

We also are not persuaded by the Commission's remaining arguments, which rely on D.C. Code § 34-604(b), a provision that gives the parties the right to seek rehearing of the Commission's orders. In its order denying reconsideration, the Commission suggested that Section 34-604(b) "supersede[s]" the general provisions of the DCAPA. The Commission does not renew that suggestion in this court. In any event, we do not agree with the suggestion.

The DCAPA provides that it "shall supplement all other provisions of law establishing procedures" for District agencies and that it "shall supersede any such law and procedure to the extent of any conflict therewith." D.C. Code § 2-501. If there were a conflict between the two sections, Section 2-509(d) therefore might well supersede Section 34-604(b), rather than the reverse. We see no conflict between the provisions, however. To illustrate, the Commission in this case could have: (1) issued a proposed order on remand, as required by Section 2-509(d);

(2) allowed Pepco and the other parties to file exceptions and present argument to a majority of the Commissioners who were going to issue the final order on remand; (3) issued a final order on the basis of the record and the arguments made pursuant to Section 2-509(d); and (4) allowed Pepco and the other parties to the action to seek reconsideration of the final order pursuant to Section 34-604(b). We thus disagree with the Commission's contention that requiring the Commission to comply with Section 2-509(d) would in some cases leave the Commission unable to issue an order.

The Commission also suggests that the procedure for reconsideration under Section 34-604(b) in effect provides the same procedural protections that are afforded under Section 2-509(d), and that any failure to comply with Section 2-509(d) therefore was not reversible error. All parties have the right to seek reconsideration under Section 34-604(b), and it is not clear to us that affording a party that general right necessarily renders harmless a failure to provide the special procedural protections afforded by Section 2-509(d). *Compare, e.g.*, *Gage v. D.C. Bd. of Zoning Adjustment*, 738 A.2d 1219, 1221 (D.C. 1999) (holding that failure to issue proposed order as required by Section 2-509(d) (then codified at D.C. Code § 1-1509(d)) was harmless where petitioner thereafter filed motion to reconsider which was granted), *with, e.g.*, *Meier v. D.C. Rental Accommodations Comm'n*, 372 A.2d 566, 568 (D.C. 1977) (holding that failure to issue proposed order as required

by D.C. Code § 1-1509(d) "requires reversal"). In any event, because we are vacating the Commission's decision on other grounds, we need not decide whether the Commission's failure to comply with the requirements of Section 2-509(d) would independently have warranted relief.

For the foregoing reasons, we vacate the orders of the Commission and remand the case for the Commission (1) to follow the procedural requirements of Section 2-509(d) and (2) to provide a more detailed analysis and explanation of a decision allocating RI costs between generation activities and distribution/transmission activities.

*So ordered.*